# Illinois Official Reports

## Appellate Court

*People v. Johnson*, 2015 IL App (1st) 123249

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUNE JOHNSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-3249 |
| Filed<br>Rehearing denied | January 28, 2015<br>February 26, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for aggravated kidnapping and two counts of aggravated criminal sexual assault were upheld on appeal, notwithstanding his contentions, *inter alia*, that the aggravated kidnapping conviction should be reversed because his asportation of the victim was incidental to the criminal sexual assault and not an independent offense, and that the aggravated criminal sexual assault should be reduced to criminal sexual assault where bodily harm was not established beyond a reasonable doubt and the indictment for that offense contained a material variance that prevented him from preparing his defense since the facts in his case supported his conviction for aggravated kidnapping, the offense was not merely incidental, and the State's theory at trial included argument and evidence with respect to bruising as a physical manifestation of the victim's bodily harm. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-21697; the Hon. Kenneth J. Wadas, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Deepa Punjabi, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Marci Jacobs, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion. Justices Lavin and Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant June Johnson appeals his convictions of one count of aggravated kidnapping and two counts of aggravated criminal sexual assault. On appeal, Johnson contends his aggravated kidnapping conviction should be reversed because his asportation of the victim was incidental to the criminal sexual assault and not an independent offense. Johnson similarly claims that his aggravated criminal sexual assault conviction should be reduced to criminal sexual assault because the aggravating factor of bodily harm was not proved beyond a reasonable doubt where the victim did not testify that she felt any physical pain from Johnson choking her and no evidence was presented that Johnson caused bruises on her arms. Johnson also claims the indictment charging him with the offense of aggravated criminal sexual assault contained a material variance because the bruises on the victim's arms were not included in the indictment as bodily harm, which precluded him from adequately preparing his defense. Finally, Johnson raises numerous trial errors that include: (1) prosecutorial misconduct during rebuttal closing argument where jurors were asked to place themselves in the victim's shoes; (2) erroneous trial court rulings relating to objections made during closing arguments; and (3) ineffective assistance of counsel. Finding no error, we affirm.

¶ 2                                    BACKGROUND

¶ 3    Johnson's convictions for aggravated kidnapping and aggravated criminal sexual assault arose from the victim J.B.'s allegations that he choked her while moving her from a sidewalk to a vacant lot where he placed his hand between her legs and inside her vagina. J.B. also alleged that Johnson then moved her–again choking her–from the vacant lot to an area between two garages where he sexually assaulted her by forcing her to engage in two separate acts of sexual intercourse. The following relevant testimony was adduced at trial.

¶ 4    J.B. testified that in June of 2010 she was 18 years old and 2½ months pregnant. J.B. stayed at times with her cousin at 75th and Eberhart in Chicago and at other times with Mario Perkins, her boyfriend and the father of her baby, who lived at 89th and Normal in Chicago. It would take J.B. approximately 1½ hours to walk between the two houses.

¶ 5    On June 12, 2010, around 1 a.m., J.B. left her cousin's house and started walking toward Perkins' house. En route to Perkins' house near 87th and Normal, J.B. walked past a tall black male, whom she identified as Johnson. J.B. continued to walk, but stopped at one point to look back and saw Johnson walking behind her. J.B. let Johnson walk past her. J.B. turned onto Normal and she noticed Johnson behind her again. When she was in the middle of the block, Johnson approached her from behind, started choking her by putting his arm around her neck, told her to be quiet and said he would kill her if she screamed. Johnson's arm around her neck felt "tight" and she had "a little bit" of trouble breathing. Initially, J.B. thought the person who approached her might have been Perkins because he would sometimes grab her from behind by putting his hand around her waist and accuse her of not paying attention.

¶ 6    Johnson moved J.B. from the sidewalk to an adjacent vacant lot. A couple of cars drove past and someone walked just inches away from them. Johnson threatened to kill J.B. if she started screaming or made a sound. Johnson forced J.B. down on the ground and she was trying to get him off of her. J.B. was crying, asking Johnson to let her go and told him she was pregnant. J.B. tried to close her legs so Johnson could not touch her, but Johnson told her the longer she kept resisting him, the longer it was going to take. While they were on the ground, Johnson put his hand under her pants, under her underwear and inside her vagina.

¶ 7    J.B. and Johnson then got up and while Johnson again choked her with his arm around her neck, he pushed J.B. toward the nearby alley and ultimately took her to an area between two garages off of the alley. According to J.B., this area was not far from the vacant lot "like a couple of feet away, a foot or so somewhere." But photographs admitted into evidence show the distance between the vacant lot and the area between the two garages was greater than J.B.'s estimate. When they got to the area between the two garages, Johnson was still standing behind J.B. with his arm around her neck applying pressure making it "a little bit" difficult to breathe. Johnson proceeded to forcibly bend J.B. over by placing both of his hands on J.B.'s shoulders and then he pulled her pants down, ripped her underwear off and raped her from behind. Johnson then told her to turn around. Johnson lifted J.B.'s leg up, put his hand over her mouth so she could not scream and raped her from the front while facing her. After raping J.B., Johnson ran away. A photograph admitted into evidence showed a pair of bright green polka dot underwear, which J.B. identified as hers, ripped and lying on the ground in between the two garages.

¶ 8    The sexual assault occurred approximately one block from Perkins' house and J.B. went there after Johnson ran away. J.B. found Perkins and told him someone raped her describing her assailant as tall, dark skinned and wearing a hoodie. Perkins left to look for J.B.'s assailant, but called the police when he could not find him. An ambulance arrived and transported J.B. to the hospital where medical personnel completed a sexual assault kit. J.B. denied describing her assailant to someone at the hospital as 5 feet 5 inches tall with a caramel complexion and testified that she described him as taller than her, weighing about 170 to 180 pounds and wearing a hoodie. J.B. also denied telling a detective two days after the assault that her assailant was 5 feet 6 inches tall.

¶ 9    Several months later in November, a detective showed J.B. photographs of men who were in police custody and asked if she could identify her assailant from the photographs. J.B. could not identify her assailant, but stated that if she saw him again in person, she would

be able to identify him. A few days later, J.B. viewed a lineup at the police station and identified Johnson as her assailant.

¶ 10      Renee Biddle was the emergency room nurse who completed a sexual assault kit on J.B. J.B. told Biddle a man came from behind and grabbed her. Biddle also testified that J.B. described her assailant as a "black male, 5 foot 5 inches, 170 to 180, red hoodie, blue jeans, caramel complexion, short braids."

¶ 11      Dr. Ahmad Shaher was the emergency room physician who examined J.B. after the assault. Dr. Shaher testified that during his general examination of J.B., he looked for potential trauma from head to toe. Dr. Shaher observed finger marks on the upper portion of J.B.'s arms. Dr. Shaher did not document any trauma to J.B.'s neck.

¶ 12      Johnson testified in his defense and admitted that he had sex with J.B. on June 12, but claimed it was consensual. Johnson first met J.B. at the bus terminal located at 95th and the Dan Ryan when he was on his way home from work. Johnson agreed to pay J.B.'s subway fare and they rode the train together. J.B. and Johnson exited at the same stop because he did not want her walking by herself that late at night while pregnant.

¶ 13      As they walked together, Johnson had his hand around J.B.'s shoulders and he became more flirtatious and physical by touching her. When they arrived to where Johnson thought J.B. was staying, Johnson asked to go inside, but she refused; instead, they went to the rear of the house and had sex. Johnson grabbed J.B.'s legs lifting her up in the air and they had sex for approximately three to four minutes. Johnson stopped after he heard someone ask, "Who is that out there in the back?" Johnson panicked, put J.B. down, pulled up his clothes and ran because he did not want to get caught. Johnson described J.B.'s underwear as pink and white striped and denied ever seeing the underwear depicted in the photo.

¶ 14      Johnson admitted picking J.B. up, but denied forcibly bending her over, putting his arm around her neck, choking her in any manner or threatening her. Johnson said he only had sex with J.B. in one position where he was holding her up in the air.

¶ 15      Detective Constance Besteda interviewed J.B. approximately two days after the incident. According to Besteda, J.B. stated she was approached from behind, grabbed, choked, fondled and knocked to the ground. J.B. also stated she was dragged into an alley where she was sexually assaulted from behind. J.B. described her assailant as around her boyfriend's height and size: 6 feet tall, 200 pounds and dark.

¶ 16      During closing arguments, the State argued that the encounter was violent and nonconsensual. In response, defense counsel attacked J.B.'s credibility, calling her a liar because her testimony was uncorroborated and incredible. During rebuttal argument, the State asserted that Johnson was not telling the truth and stated:

> "MS. MOJICA [Assistant State's Attorney]: If any one of you got in a car accident and you didn't have injuries, or there wasn't someone there to *** see it, let's say you got hit and run–
>
> MR. WRECK [defense attorney]: Objection.
>
> THE COURT: Overruled.
>
> MS. MOJICA: Does that mean that you didn't get in a car accident? Does that mean that no one should take you at your word? Why wouldn't someone believe you if you were telling the truth, if you had details about where it happened; the proximate time that it happened; a description of the person who hit you with their car, maybe

some damage to your car? Those are the type of things that support what people have to say."

¶ 17    After deliberations, the jury found Johnson guilty of aggravated kidnapping, aggravated criminal sexual assault during the commission of a kidnapping, and aggravated criminal sexual assault causing bodily harm. Johnson filed a motion for a new trial, which the trial court denied. Johnson was sentenced to two terms of natural life in prison to run consecutively. Johnson timely appealed.

¶ 18                                    ANALYSIS

¶ 19                          A. Sufficiency of the Evidence

¶ 20    Johnson challenges the sufficiency of the evidence regarding his conviction for aggravated kidnapping because the State failed to prove the required element of asportation. Johnson similarly challenges the sufficiency of the evidence supporting his conviction for aggravated criminal sexual assault where the State failed to present evidence beyond a reasonable doubt that J.B. suffered bodily harm from his alleged choking of her or that he caused the bruises on her arms.

¶ 21    When a defendant challenges the sufficiency of the evidence, this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Cox*, 195 Ill. 2d 378, 387 (2001). A reviewing court may set aside a criminal conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). All reasonable inferences from the record must be viewed in favor of the prosecution. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). The trier of fact assesses the credibility of witnesses, determines the weight of the testimony and resolves conflicts or inconsistencies in the evidence. *People v. Brown*, 2013 IL 114196, ¶ 48. A reviewing court may not substitute its judgment for the trier of fact on those issues and its function is not to retry the defendant. *Id.*; *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004).

¶ 22                    1. Aggravated Kidnapping–Asportation

¶ 23    The offense of kidnapping may be committed in the following ways: (1) confinement of the victim; (2) asportation of the victim; or (3) inducement of the victim to go from one place to another with secret intent to confine the victim against her will. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). An individual commits the offense of kidnapping by asportation when the perpetrator knowingly "by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will." 720 ILCS 5/10-1(a)(2) (West 2010). As relevant here, aggravated kidnapping involves the infliction of "great bodily harm, other than by the discharge of a firearm" or the commission of "another felony" on the victim. 720 ILCS 5/10-2(a)(3) (West 2010). Johnson claims the State failed in its burden to prove beyond a reasonable doubt the asportation element of either kidnapping or aggravated kidnapping.

¶ 24    In *People v. Eyler*, 133 Ill. 2d 173, 199 (1989), our supreme court reiterated the *Levy-Lombardi* doctrine, under which a defendant "cannot be convicted of kidnapping where the asportation or confinement of the victim was merely incidental to another crime, such as

robbery, rape or murder." A court must consider the following factors to determine whether the asportation amounts to the independent crime of kidnapping: "(1) the duration of the asportation or detention; (2) whether the asportation or detention occurred during the commission of a separate offense; (3) whether the asportation or detention is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense." *Siguenza-Brito*, 235 Ill. 2d at 225-26; *People v. Jackson*, 331 Ill. App. 3d 279, 294 (2002). Whether the asportation constitutes a kidnapping is fact specific and depends on the circumstances of each case. *People v. Quintana*, 332 Ill. App. 3d 96, 105 (2002). We find that the facts of the instant case support Johnson's conviction for aggravated kidnapping.

¶ 25     The first factor concerning duration was satisfied because Johnson moved J.B. from a sidewalk to a vacant lot and then from the vacant lot across an alley to an area between two garages. Under well-settled authority, the brevity of the asportation or limited distance of the movement does not preclude a kidnapping conviction. See *Siguenza-Brito*, 235 Ill. 2d at 225-26 (holding that an asportation lasting only a few minutes was sufficient to support a separate kidnapping charge); *Jackson*, 331 Ill. App. 3d at 294 (noting cases in which asportation of less than one block and detention of a few minutes have been sufficient to support a kidnapping conviction); *People v. Rush*, 238 Ill. App. 3d 806, 816-17 (1992) (confining the victim for 5 minutes 50 feet from the original location was sufficient to convict the defendant of aggravated kidnapping); *People v. Casiano*, 212 Ill. App. 3d 680, 687-88 (1991) (holding that an asportation of 1½ blocks at knifepoint was sufficient to support a separate kidnapping charge); *People v. Thomas*, 163 Ill. App. 3d 670, 678 (1987) (kidnapping conviction upheld where the defendant transported the victim half a block). Moreover, J.B.'s testimony that Johnson dragged her "a couple of feet away" is contradicted by the photographs of the scene admitted into evidence which reveal that the asportation extended from the vacant lot to the rear of a city lot. Thus, the proof at trial satisfies the first factor.

¶ 26     The second factor–that the asportation occurred during the commission of a separate offense–was satisfied because both the asportation from the sidewalk to the vacant lot and from the vacant lot to the area between the two garages occurred before, rather than during, a sexual assault. See *People v. McCarter*, 2011 IL App (1st) 092864, ¶ 64 (stating that, generally, "when the asportation occurs prior to the commission of the separate offense, a kidnapping charge will lie"); *Jackson*, 331 Ill. App. 3d at 294 (and cases cited therein) (recognizing a separate offense of kidnapping when the asportation occurs before rather than during a sexual assault). There is no evidence in the record that Johnson sexually assaulted J.B. as he moved her from the vacant lot across the alley to the area between the garages. Contrary to Johnson's assertion, his sexual acts committed against J.B. were not one continuous act, but separate and distinct acts as no intercourse occurred while J.B. was in the vacant lot where he completed a separate sexual act there (penetrating her vagina with his finger) before moving her to the area between the two garages where he raped her twice.

¶ 27     Regarding the third factor, asportation is inherent in a separate offense when it is an element of that offense. *Quintana*, 332 Ill. App. 3d at 108. Asportation of a victim is not an element of aggravated criminal sexual assault. 720 ILCS 5/12-14 (West 2010); *Jackson*, 331 Ill. App. 3d at 295. Thus, when Johnson moved J.B. from the vacant lot to the rear of the lot and, ultimately, to the area between the two garages against her will, Johnson committed a

separate offense. *Siguenza-Brito*, 235 Ill. 2d at 226; see *People v. Riley*, 219 Ill. App. 3d 482, 489 (1991) (forced movement of the victim from one location to another is not inherent in the offense of criminal sexual assault). Accordingly, the third factor was satisfied.

¶ 28      Finally, Johnson's asportation of J.B. to the area between the garages created an independent, significant danger because when Johnson moved J.B. to a more secluded area further away from the street and sidewalk, he heightened the danger to J.B. by decreasing the likelihood that anyone would see or hear what was transpiring, especially in the dark in the middle of the night. While Johnson and J.B. were in the vacant lot, vehicles drove by and an individual walked past undoubtedly prompting Johnson to move J.B. to the more secluded and private area, which demonstrates his intent to secretly confine J.B. during the assault. Johnson analogizes this case to *People v. Lamkey*, 240 Ill. App. 3d 435, 439 (1992), where the defendant grabbed the victim, who was on her way to school, pulled her into the vestibule of a building located a couple of steps away from one of the busiest streets in Chicago and remained within that area clearly visible to anyone walking or driving down the street while he sexually assaulted her. *Id.* Johnson's reliance on *Lamkey* is misplaced because the sexual assault here did not occur in daylight, at a time when the sidewalk and street were crowded with people or mere steps away from any street, much less a busy street. *Id.* Moreover, unlike in *Lamkey* where this court held that the asportation did not pose a more significant danger to the victim, Johnson threatened to kill J.B. and had his arm around her neck, impairing her breathing, and moved her to a more secluded location, both which increased the danger to her. *Id.* at 440. Thus, the asportation created a significant danger to J.B. independent of the danger created by the rape. *Siguenza-Brito*, 235 Ill. 2d at 226 (moving the victim to a closed garage posed a significant danger independent of the rape because of the privacy of the closed garage); *People v. Lloyd*, 277 Ill. App. 3d 154, 164 (1995) (holding the defendant created a significant danger independent of the danger posed by the sexual assault when he grabbed the victim from behind, threatened and forced the victim to walk in that manner).

¶ 29      Applying the four factors to the evidence offered by the State, we conclude a rational trier of fact could have found the independent offense of kidnapping under an asportation theory and that offense was not merely incidental to the offense of criminal sexual assault. *Siguenza-Brito*, 235 Ill. 2d at 227; see *Jackson*, 331 Ill. App. 3d at 295 (aggravated kidnapping was not incidental to sexual assault because asportation of the victim was carried out separately from the sexual assault and caused an independent danger); *People v. Watson*, 342 Ill. App. 3d 1089, 1099 (2003) (aggravated kidnapping was not incidental to the sexual assault where the defendant threatened the victim at gunpoint forcing her to exit the vehicle and into his apartment before sexually assaulting her). Consequently, because the State presented sufficient evidence supporting the independent offense of kidnapping, we disagree with Johnson that his conviction for aggravated kidnapping should be reversed and that his conviction for aggravated criminal sexual assault based on a sexual assault during the commission of a separate felony–kidnapping–should be reduced to criminal sexual assault.

¶ 30                    2. Aggravated Criminal Sexual Assault–Bodily Harm

¶ 31      A person commits aggravated criminal sexual assault if that person commits criminal sexual assault and causes bodily harm to the victim. 720 ILCS 5/12-14(a)(2) (West 2010). The term "bodily harm" when used in the context of aggravated criminal sexual assault has the same meaning as used under the battery statute. *People v. Bishop*, 218 Ill. 2d 232, 249-50

(2006). Bodily harm–difficult to precisely define–requires physical pain or damage to the body, *i.e.*, lacerations, bruises or abrasions, whether temporary or permanent. *People v. Mays*, 91 Ill. 2d 251, 256 (1982); *People v. Roberts*, 182 Ill. App. 3d 313, 320 (1989). When deciding whether the defendant's actions caused bodily harm, the trier of fact may consider direct evidence of an injury and may equally infer an injury based upon circumstantial evidence in light of common experience. *Bishop*, 218 Ill. 2d at 250.

¶ 32    We first consider the evidence regarding Johnson's conduct in choking J.B. and conclude that the record supports a finding that Johnson caused bodily harm to J.B. when he choked her. J.B. testified that Johnson placed his arm around her neck, choking her, when he moved her from the sidewalk to the vacant lot and again when he moved her from the vacant lot to the area between the two garages. Although J.B. did not explicitly testify that she felt physical pain when Johnson was choking her, common experience dictates that J.B. would have felt physical pain when she was involuntarily moved by Johnson who had his arm around her neck applying pressure to the point that it felt "tight." Because J.B. testified that it felt "tight," any notion that Johnson loosely placed his arm around J.B.'s neck is not supported by the record. J.B. also testified she had "a little bit" of trouble breathing while Johnson was choking her. J.B.'s testimony that Johnson applied pressure on her airway, which felt tight, interfering with her breathing was sufficient evidence for the jury to reasonably infer based on common experience and knowledge of "choking" that J.B. felt physical pain. Notably, J.B. did not testify that Johnson strangled her, which would presumably have left hand marks around her neck, and the fact that there was no "damage" around J.B.'s neck does not preclude a finding of bodily harm where she likely felt physical pain. See *People v. McCrimmon*, 225 Ill. App. 3d 456, 466 (1992) (finding bodily harm where victim testified he felt pain); *People v. Wenkus*, 171 Ill. App. 3d 1064, 1067 (1988) (citing cases finding bodily harm where no medical attention was required and no evidence of injury was demonstrated). Moreover, it was the State's burden to prove beyond a reasonable doubt only that J.B. experienced some level of physical pain, which a reasonable jury could infer occurred when she felt tightness around her neck and had difficulty breathing.

¶ 33    Considering the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Johnson caused bodily harm to J.B. when he choked her. *Bishop*, 218 Ill. 2d at 250 (the jury could infer the defendant caused physical injury to the victim because she cried when the defendant began to penetrate her anally and the anal penetration caused scar tissue to form); *People v. Jones*, 273 Ill. App. 3d 377, 384 (1995) (evidence supporting bodily harm was not so improbable as to raise a reasonable doubt of guilt where the victim testified the defendant struck her several times about the head with a bottle causing knots, which were observed by the victim's sister after the attack, but the emergency room doctor did not detect any injury to her head, face or neck); *People v. Hayes*, 15 Ill. App. 3d 851, 860 (1973) (in a nonsexual assault case, finding evidence sufficient, if believed, to establish great bodily harm where the victim was kicked in the groin). Consequently, the jury did not err in finding Johnson guilty of aggravated criminal sexual assault because the State offered sufficient evidence of bodily harm based on Johnson choking J.B. Accordingly, we need not consider whether Johnson caused the bruises to J.B.'s arms to find bodily harm as that element was established when Johnson choked J.B. We similarly need not address Johnson's alternative argument that he suffered prejudice because the indictment did not list

bruising as the alleged cause of bodily harm, but the State's theory at trial included argument and evidence regarding the bruising as a physical manifestation of the bodily harm Johnson caused J.B.

¶ 34                                     B. Trial Errors

¶ 35    Johnson also contends he was denied his right to a fair trial because: (1) the prosecutor engaged in misconduct during rebuttal argument; (2) the trial court made erroneous evidentiary rulings; and (3) trial counsel provided ineffective assistance. Johnson claims these errors deprived him of his constitutional right to a fair trial and warrant reversal of his convictions. We disagree.

¶ 36                                1. Prosecutorial Misconduct

¶ 37    Johnson contends the State's rebuttal closing argument improperly asked the jurors to place themselves in J.B.'s shoes and the prejudicial effect of that error deprived him of a fair trial because J.B.'s credibility was improperly bolstered. Johnson claims the prejudicial effect of that error was further exacerbated because: (1) the trial court overruled the contemporaneous objection to the improper argument; (2) defense counsel was unable to respond to the State's improper rebuttal remarks; and (3) the evidence was closely balanced.

¶ 38    It is well established that a prosecutor has wide latitude in making a closing argument and may comment on the evidence and any fair, reasonable inferences it yields. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Although prosecutors are accorded wide latitude in closing argument, they may not argue assumptions or facts not based on the evidence. *Id.* When reviewing challenges to remarks made during closing argument, the remarks are viewed in context and a closing argument is viewed in its entirety. *Id.* Prosecutors are entitled to respond to comments the defense makes during closing that clearly invite a response. *People v. Kliner*, 185 Ill. 2d 81, 154 (1998).

¶ 39    The parties disagree regarding the applicable standard of review with Johnson proposing a *de novo* standard and the State advocating an abuse of discretion standard. This court has noted confusion regarding the appropriate standard of review regarding alleged errors occurring during closing arguments that originates from our supreme court's apparent conflicting holdings in *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) (utilizing *de novo* standard of review to determine whether claimed improper arguments so egregious as to warrant a new trial), and *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (employing an abuse of discretion standard). *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 32; *People v. Maldonado*, 402 Ill. App. 3d 411, 421 (2010); *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008). We, however, need not resolve the issue because under either standard, we reach the same conclusion. *Daniel*, 2014 IL App (1st) 121171, ¶ 32.

¶ 40    Johnson objects to the rebuttal argument quoted above in which the State analogized J.B.'s account of the attack to a hit-and-run accident witnessed by no one and leaving no visible injuries on the victim. Johnson claims those remarks invited the jurors to place themselves in the same scenario J.B. faced where her account of the events was challenged encouraging the jury to give credence to her account and thus improperly bolstering her testimony.

¶ 41    We disagree because Johnson mischaracterizes the State's remarks as encouraging jurors to "place yourself in the victim's shoes." The State's remarks merely asked the jury to consider an analogy comparing J.B.'s injuries to those sustained in an automobile accident where there were no visible injuries or witnesses creating doubt that a car accident even occurred. The State did not ask the jurors to place themselves in J.B.'s shoes as a victim of rape, but offered an analogy for purposes of assessing J.B.'s credibility. The State's analogy aided the jury in understanding the evidence and was clearly not designed to arouse the jury's sympathy for a rape victim.

¶ 42    Moreover, the State's analogy was in response to remarks made by defense counsel during closing argument. Defense counsel argued "If June Johnson had been choking [J.B.] around the neck for a period of minutes, while June Johnson is allegedly sexually assaulting her, she would have marks on her neck. You have no evidence of any marks whatsoever. You heard from Dr. Shahair. He looked her over from head to toe, and there were absolutely no marks on her neck." The State's analogy was directly in response to the inference Johnson created that because there were no marks on J.B.'s neck, the sexual assault did not happen. Johnson cannot claim prejudice because the State's comments were responsive to the remarks made by defense counsel during closing.

¶ 43    Furthermore, the evidence was not closely balanced where identification of the assailant was not in issue and tests affirmatively established that Johnson's DNA was found on J.B.'s vaginal and anal areas. The fact that the jury's verdict rested on an assessment of the credibility of witnesses does not *ipso facto*, make this a closely balanced case, especially where the State offered evidence to corroborate J.B.'s testimony. *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 88. A new trial or reversal is warranted where the prosecutor's remarks result in substantial prejudice or serve no purpose other than to inflame the passions of the jury, which cannot be said with regard to the State's rebuttal remarks here. *People v. Gant*, 202 Ill. App. 3d 218, 227 (1990). Because we find that the State's rebuttal argument was proper, we likewise reject Johnson's assertion that the trial court erred in overruling defense counsel's objection to that argument.

¶ 44                                    2. Judicial *Sua Sponte* Rulings

¶ 45    Johnson next assigns error to the trial court's conduct in sustaining its own *sua sponte* objection during defense counsel's closing argument. Johnson characterizes the trial court's conduct as startling and argumentative and contends it transformed the trial judge's role from neutral to that of a prosecutor. The trial transcript reflects the following:

> "MR. WRECK [defense attorney]: I am asking you to follow your oaths, in the end I think it's very easy, with respect to all three of the charges that June Johnson faces, and give you one final last plea for me: Please don't compromise and think that one of these charges can offset the other. You have an independent–
>
> THE COURT: Sustained.
>
> MR. WRECK: I would ask you to very carefully consider your oaths and render a decision consistent with the evidence, a verdict of not guilty."

¶ 46    The State asserts Johnson forfeited this contention by not making a contemporaneous objection, but acknowledges Johnson included this claim of error in a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an alleged error for review, the

defendant must both object at trial and raise the issue in a written posttrial motion). Analysis under either harmless error, where a defendant objects during trial, or plain error, where no objection was made, begins with a finding that an error occurred during trial. See *People v. Nitz*, 219 Ill. 2d 400, 410 (2006) (explaining that under a harmless-error analysis the State must prove beyond a reasonable doubt that the result would have been the same absent the error and under a plain-error analysis the defendant must convince the court that the error was prejudicial). Here, there was no error.

¶ 47　　　　The trial court did not err by sustaining its own objection to defense counsel's argument following his plea to the jury not to compromise and offset one charge against another because this argument was improper. Counsel's remarks assumed, even before deliberations began, that the jury would reach a compromise verdict and urged the jury not to offset the charges against one another. We agree that counsel's argument was an improper attempt to tell the jury how to conduct deliberations and such remarks are not within the parameters of proper closing argument. Because counsel's remarks were outside the permissible scope of closing arguments–limited to matters in evidence or admitted and uncontroverted–the trial court was not required to wait for the State to object before preventing defense counsel from making additional improper remarks. *Foerster v. Illinois Bell Telephone Co.*, 20 Ill. App. 3d 656, 661-62 (1974).

¶ 48　　　　Johnson further claims the trial judge's tone in sustaining his own objection prejudiced him because it created the appearance that the trial court was biased against him. Johnson acknowledges the judge's tone is not reflected in the record but nonetheless claims the tone was harsh creating a negative impression of the defense in front of the jury.

¶ 49　　　　While a trial judge must refrain from conveying improper impressions to the jury (*People v. Brown*, 172 Ill. 2d 1, 38 (1996)) we fail to see how the single word–"sustained"–uttered by the trial judge–no matter how emphatically–could possibly constitute a material factor in Johnson's conviction or was such that an effect on the jury's verdict was the probable result. *Id.* at 38-39. Further, the single word uttered by the trial judge was isolated and occurred at the conclusion of defense counsel's argument, thus undermining any claim of demonstrable bias against the defense. Consequently, we reject Johnson's claim that he was prejudiced by the trial court sustaining its own objection and conclude there was no error.

¶ 50　　　　　　　　　　　　　3. Ineffective Assistance of Counsel

¶ 51　　　　Johnson claims his counsel provided ineffective assistance because counsel: (1) failed to properly impeach J.B. with a prior inconsistent physical description of her assailant; (2) failed to admit Detective Besteda's prior inconsistent statement from a pretrial hearing; and (3) elicited testimony from J.B. that "another victim" existed. Johnson also claims trial counsel erred when he failed to call as a witness the officer to whom J.B. originally provided a description shortly after the assault.

¶ 52　　　　To prevail on an ineffective assistance claim, a defendant must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hodges*, 234 Ill. 2d 1, 17 (2009). Under *Strickland*, "a defendant must show both that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense." (Internal quotation marks omitted.) *Id*. A claim of ineffective assistance of counsel cannot be established if either prong of the *Strickland* test is not satisfied. *Id*. Matters of trial strategy generally will not support a claim of ineffective assistance unless counsel

failed to conduct any meaningful adversarial testing. *People v. Patterson*, 217 Ill. 2d 407, 441 (2005). Counsel's decision whether to call certain witnesses on a defendant's behalf is a matter of trial strategy and is generally immune from claims of ineffective assistance unless counsel abandoned his role as an adversary. *People v. Enis*, 194 Ill. 2d 361, 378 (2000).

¶ 53 We disagree with Johnson that counsel's failure to impeach J.B. with the description he claims she provided to the police on June 12 amounted to ineffective assistance. Johnson acknowledges that counsel impeached J.B. with the emergency room nurse's testimony regarding J.B.'s description of the assailant and that identity was not in issue, but claims J.B. should have been further impeached with the description provided to the officer immediately after the attack because credibility was at issue. Under Johnson's theory, J.B. was motivated to give an inaccurate description of her alleged attacker because the encounter between Johnson and J.B. was consensual and J.B. did not want Perkins to find out. This, of course, begs the question of why J.B. would tell Perkins that she had been raped and later identify Johnson in a lineup. But, in any event, the evidence in the record allowed the jury to make a determination regarding J.B.'s credibility because counsel impeached her with her prior description provided to a testifying witness and impeaching her again on the same issue would have been merely cumulative. The record and Johnson's own admission that he engaged in sexual intercourse with J.B. rebut any claim that counsel's failure to pursue additional impeachment constituted ineffective assistance. *Patterson*, 217 Ill. 2d at 441.

¶ 54 Johnson also claims counsel was ineffective for failing to impeach Detective Besteda with his statement during a pretrial hearing that J.B.'s description of her assailant as 6 feet tall was not her original description, but a revised description. We disagree.

¶ 55 During trial, Detective Besteda testified that according to his final supplemental report completed after Johnson's arrest, J.B. described her assailant as approximately 6 feet tall and around 200 pounds. The record establishes the jury heard Detective Besteda state J.B.'s description of her assailant was included in a final report allowing the jury to reasonably infer that the description may have varied from an earlier version of the report. Eliciting testimony from Detective Besteda that during a prior hearing he stated J.B.'s description of the assailant as 6 feet tall was an "updated" description would not have provided any new or inconsistent testimony useful to attack J.B.'s credibility. Because the information Johnson alleges should have been presented to the jury was sufficiently presented through Detective Besteda's direct testimony, Johnson failed to establish that his counsel's performance was objectively unreasonable, especially given that impeachment and cross-examination of a witness is a matter of trial strategy. *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). Moreover, for the same reason, counsel's decision not to call another officer to testify regarding J.B.'s description of her assailant was also a matter of trial strategy and insufficient to support a claim of ineffective assistance of counsel.

¶ 56 Johnson further claims counsel was ineffective by eliciting from J.B. that Johnson was accused of raping another victim. During cross-examination of J.B., counsel asked her if anyone else was in the vehicle when she was driven to the police station to view the physical lineup. J.B. responded that "another victim" was in the vehicle. Johnson claims counsel knew that "another victim" may have been with J.B. and her answer to his question was damaging leaving the jury to speculate that Johnson may have been accused of another crime.

¶ 57 The record rebuts Johnson's claim. During a pretrial hearing, Johnson asserted that the physical lineup identification was suggestive because both J.B. and another rape victim

viewed the lineup together. Contrary to Johnson's position, Detective Besteda testified during the hearing that the other woman arrived at the police station before J.B. and that both women were in separate rooms having no contact with each other. Thus, nothing in the record would have alerted counsel that J.B. would respond "another victim" was traveling to the police station with her, especially since it would have been reasonable for counsel to assume that Perkins, J.B.'s boyfriend, would have accompanied J.B. to the station, thus prompting counsel's question.

¶ 58    In sum, Johnson's contentions, either alone or in combination, fail to establish that counsel's performance fell below an objective standard of reasonableness and that the alleged deficient performance prejudiced the defense. Further, because we find no merit to any of Johnson's claimed errors, we need not address his argument regarding the cumulative effect of those claimed errors.

¶ 59                                    CONCLUSION

¶ 60    For the foregoing reasons, we affirm Johnson's convictions for aggravated kidnapping and aggravated criminal sexual assault.

¶ 61    Affirmed.