2021 IL App (1st) 181803-U

No. 1-18-1803

FIFTH DIVISION
MARCH 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 DV 20153 |
| | ) | |
| ANJUM MERCHANT, | ) | Honorable |
| | ) | Callie Lynn Baird, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Delort and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for misdemeanor domestic battery is affirmed over his challenge to the sufficiency of the evidence. The trial court did not shift the burden of proof by rejecting defendant's theory of the case.

¶ 2                                BACKGROUND

¶ 3     Following a bench trial, defendant Anjum Merchant (Anjum) was found guilty of misdemeanor domestic battery against his wife, Nimet Merchant (Nimet),[1] and sentenced to 1 year of conditional discharge and 30 hours of community service in the Sheriff's Work Alternative Program (SWAP). Anjum appeals, arguing that the State failed to prove his guilt beyond a reasonable doubt and the trial court improperly shifted the burden of proof to him. We affirm the judgment of the circuit court of Cook County.

¶ 4     Anjum was charged by misdemeanor complaint with domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)) in that he knowingly and without legal justification caused bodily harm to Nimet, his wife.

¶ 5     At trial, Nimet testified that, on September 9, 2017, Anjum arrived at their home in the 8700 block of Kedvale Avenue, in Skokie, between 12 midnight and 1 a.m. At around 1 or 2 a.m., Nimet was doing chores in the kitchen while Anjum watched television in the dining room, which was adjacent to the kitchen. Nimet avoided conversation with defendant because he had threatened her and been unpleasant to her the day before.

¶ 6     At some point, Anjum hit Nimet's head from behind with a hard object. Nimet testified that the pain was "shocking." Nimet screamed and Anjum held her shoulders with both his hands and punched her. Nimet tried to run from the kitchen but could not. Meanwhile, Anjum broke dishes on the kitchen floor. Anjum pulled Nimet's hair to turn her around and squeezed Nimet's neck with both hands making it hard for her to breathe. Anjum told Nimet, "I will kill you." Nimet grew dizzy but did not lose consciousness.

---

[1] We refer to Nimet Merchant by her first name because the defendant and another witness, Afsha Merchant, have the same last name. For the same reason, we also refer to the defendant and Afsha by their first names.

¶ 7    Anjum pulled Nimet by her hair to the living room where he "dashed" Nimet's face against a wall multiple times and punched her in the stomach. Nimet tried to flee, but Anjum kicked her and she fell to the floor. At some point during the confrontation, Nimet was able to make her way to the garage, where she locked herself in her car, and called 911.

¶ 8    Police officers soon arrived and Nimet opened the garage for the police, who called an ambulance. Nimet declined to go to the hospital because she did not want to go alone, and the police asked Anjum to leave the home but did not arrest him.

¶ 9    The police and paramedics left between 2 and 3 a.m. Sometime after that, Nimet texted her and Anjum's daughter, Afsha. Nimet felt dizzy, was sick and vomited. She fell asleep at around 5:30 or 6 a.m. She awoke to a telephone call from the police, who told Nimet that her daughter was looking for her. Afsha then arrived at the house, photographed Nimet, and called the police again. Police officers arrived and called an ambulance, which took Nimet to the hospital. There, Nimet spoke to different police officers, who also photographed her. The parties stipulated to the foundation for those photographs and they were admitted into evidence.

¶ 10    On cross-examination, Nimet testified that she and Anjum did not speak after he arrived home on September 9, 2017. Anjum was watching television and then suddenly hit her on the head from behind with a hard, unknown object. Nimet also testified that she did not know how Anjum broke the dishes on the kitchen floor as she tried to flee. When asked if she told Detective Will Zahn that Anjum picked the dishes out of the sink and threw them to the floor, Nimet stated that she did not observe whether Anjum threw one dish or all of them. Nimet confirmed that Anjum slammed her face into a wall numerous times, including her nose, but she did not know if her nose was injured and her glasses did not break. She stated she sustained a bruise, and the court noted

that she pointed to her forehead. She stated that she told Detective Zahn that Anjum kicked her in the stomach and back.

¶ 11     Nimet showed her injuries to Officer Tammy Jacobsen, the officer who responded to her 911 call.  Nimet declined to go to the hospital because she was alone, dizzy, confused, and scared of what Anjum would do next. Nimet looked in a mirror 20 minutes after the police left and saw a big bruise and little cuts on her forehead as well as scratches on her arms.

¶ 12     Afsha Merchant, the daughter of Nimet and Anjum, testified as follows.  She received a text message from Nimet on the morning of September 9, 2017. Afsha called Nimet multiple times but did not hear from her, so Afsha called the police and went to Nimet's home. Nimet looked weak and fragile, was shaking, and had blackish bruising all over her neck. The State noted for the record that Afsha put her pointer finger and her thumb towards her neck and went from left to right.  Nimet also had scratches on her left arm.

¶ 13     Afsha photographed Nimet, and identified the photographs during her testimony at trial, noting that they show bruising around Nimet's neck and scratches on her arms. After seeing Nimet's injuries, Afsha called the police again. Two police officers arrived and called an ambulance. Nimet was taken to the hospital.

¶ 14     On cross-examination, Afsha admitted that prior to September 9, 2017, Anjum had obtained an order of protection against Nimet, which angered and upset Afsha. Also prior to September 9, 2017, Afsha sent a voice message to Anjum stating that he would face consequences for making a false allegation against Nimet.

¶ 15     Although Afsha previously stated that she called Nimet on September 9, 2017, and did not hear from her, Afsha also stated that she spoke with Nimet on the telephone after reading Nimet's

text message. At the hospital, Afsha observed the same bruising to Nimet's neck that she had observed at the home and photographed her again.[2] Afsha testified that she was upset with Anjum over the order of protection against Nimet.

¶ 16    Officer Jacobsen testified that, around 2 or 2:30 a.m. on September 9, 2017, she was dispatched to the home for a reported domestic battery. When she arrived, Nimet was exiting a vehicle in the garage. Officer Jacobsen observed scratches on the outer part of Nimet's upper left arm. Officer Jacobsen spoke with Nimet and did not notice any other injuries.

¶ 17    In the kitchen, Officer Jacobsen saw broken porcelain or ceramic on the floor. Anjum sat in the living room with other officers. Nothing in the living room was out of the ordinary. Officer Jacobsen spoke with Anjum, who denied hitting Nimet. Officer Jacobsen asked him how Nimet sustained scratches to her arm and how the item on the kitchen floor got broken. He stated that Nimet must have done it to herself and that he had heard her breaking something while he was upstairs sleeping. Anjum stated that he went partway downstairs when he heard something break, but Nimet then entered the garage, so he returned upstairs and slept until he was awakened by police.

¶ 18    On cross-examination, Officer Jacobsen testified that she had been trained to look for visible signs of injury, fear, and distress in alleged domestic violence victims. Officer Jacobsen stood right next to Nimet outside the garage, near a streetlight. Jacobsen confirmed that she immediately noticed the injuries to Nimet's arm, although the injuries were faint, superficial, and not bleeding, "[a]s if they were nail scratches." Officer Jacobsen did not recall if Nimet had long

_____

[2] The photographs that Afsha took at the hospital were not introduced at trial and are not included in the record on appeal.

nails. Nimet told Officer Jacobsen that Anjum struck her in the back of the head, slammed her head into a wall, and punched her. Nimet indicated she had pain in the back of her head and forehead. Jacobsen searched for redness, swelling, or bruising on Nimet's head but did not observe any. Nimet did not tell Officer Jacobsen that Anjum choked her, and Officer Jacobsen did not look for an injury to her neck. Officer Jacobsen denied noticing anything unusual on Nimet's neck.

¶ 19    When Officer Jacobsen asked Nimet why there was broken porcelain on the kitchen floor, Nimet stated that Anjum hit her with something. She did not tell Officer Jacobsen that Anjum removed dishes from the sink and threw them or knocked them off the counter. Officer Jacobsen did not arrest Anjum, who was cooperative and not agitated. Officer Jacobsen did not photograph Nimet's injuries or see her again. On redirect examination, Officer Jacobsen confirmed that she could clearly see the scratches on Nimet's arms.

¶ 20    Detective Zahn testified that he and a partner met with Nimet at the hospital around 9 a.m. on September 9, 2017. Nimet was in bed wearing a hospital gown, and Detective Zahn observed visible injuries on her neck and forehead. Specifically, there was a bruise or a raised bump on the top of her head, bruising on the right side of her neck, and scratches on her arms. An evidence technician photographed Nimet. Nimet told Detective Zahn how she was injured. Detective Zahn also spoke with Afsha, who was at the hospital. Detective Zahn then looked for Anjum.

¶ 21    Following a telephone call, Anjum agreed to meet Detective Zahn and his partner at the police department. There, Detective Zahn advised Anjum of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and he verbally waived them. Anjum stated that, after he came home in the early morning of September 9, 2017, he smoked a cigarette, changed clothes, and watched television on the first floor before retiring upstairs to his bedroom around 1:30 a.m. The police

woke him at 2 a.m. Detective Zahn initially confirmed that, before the police arrived, Anjum was awakened by the sound of things breaking downstairs. After consulting his supplemental case report, however, Detective Zahn denied Anjum had told him that.

¶ 22     On cross-examination, Detective Zahn stated he did not recall Nimet saying that Anjum watched television before battering her. Rather, Nimet said she was washing dishes when Anjum struck her from behind. Nimet told Detective Zahn that Anjum took dishes from the sink and threw them to the floor. Anjum also put his hands around Nimet's neck and choked her. Anjum threw Nimet to her knees and then into the wall.

¶ 23     Detective Zahn observed scratches on Nimet's arms. One arm had very small scratches as well as longer ones. He also observed small scratches like gouging on both her hands, larger scratches on one of her forearms, and slightly raised bruising on her forehead. Detective Zahn did not recall if Nimet's forehead was red or had scratches. Detective Zahn did not see Afsha photograph Nimet, and neither Afsha nor Nimet told Detective Zahn that they had photographs. Anjum denied battering Nimet.

¶ 24     At the close of the State's case, Anjum moved for a directed finding, arguing that Officer Jacobsen only observed faint scratches on her arm, and she did not arrest Anjum. It was only after Afsha arrived that Nimet exhibited more severe injuries. The court denied the motion and the defense rested.

¶ 25     Both the State and defense counsel gave closing arguments after which the court announced its findings. The court noted that Anjum gave inconsistent statements to Detective Zahn and Officer Jacobsen. The court found Nimet's testimony very credible and corroborated by the police testimony, and photographs. The court noted that the photographs depict "dark marks" on Nimet's

neck and scratches on her forearm, upper arm, and hand. The court found that the State proved Anjum choked Nimet, slammed her head into a wall, and scratched her arm. The court entered a finding of guilty.

¶ 26    Anjum filed a motion to reconsider, arguing in relevant part that Nimet's testimony was inconsistent with Officer Jacobsen's observation of her injuries. The State responded that its witnesses were credible and that different witnesses might have observed different injuries to Nimet because injuries may "manifest differently at different times." When defense counsel posited that there would be redness or swelling immediately after Nimet's injuries were sustained, the court responded:

> "Well, *** I don't know. There wasn't an expert witness that testified to tell me your position that it is more reasonable and physiologically more probable that the injuries would appear immediately after someone is struck, slammed, choked, given their body type, the complexion of their skin, and numerous other factors that would need to be taken into account. Or whether it's more probable that it would appear later. No one testified to that."

¶ 27    The court continued that it listened to all the testimony, found Nimet's testimony credible and unimpeached, regarding what "she said occurred to her." The court denied Anjum's motion. Following a post-trial hearing, the court sentenced Anjum to 1 year of conditional discharge and 30 hours of SWAP community service.

¶ 28                                    ANALYSIS

¶ 29    We note that Anjum filed a timely notice of appeal.  Therefore, we have jurisdiction to hear this matter. On appeal, Anjum first argues that the State failed to prove his guilt beyond a

reasonable doubt as Nimet's testimony was incredible, inconsistent with her statement to Officer Jacobsen and inconsistent with the photographs; and was contradicted by Officer Jacobsen's testimony.

¶ 30     When faced with a challenge to the sufficiency of the evidence, a reviewing court determines whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *People v. Swenson*, 2020 IL 124688, ¶ 35. A reviewing court will not retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. The trier of fact is charged with resolving conflicts in the testimony; weighing the evidence; and drawing reasonable inferences from the facts. *Id.* Therefore, a reviewing court will not substitute its judgment for the trier of fact's when considering the weight of the evidence or the credibility of the witnesses. *Id.* A conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Swenson*, 2020 IL 124688, ¶ 35. The testimony of one credible witness may sustain a conviction. *Id.* ¶ 36.

¶ 31     As charged here, a person commits domestic battery if he knowingly and without legal justification causes bodily harm to any family or household member. 720 ILCS 5/12-3.2(a)(1) (West 2016). Spouses are family or household members. 720 ILCS 5/12-0.1 (West 2016). To show bodily harm, "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent, is required." *People v. Mays*, 91 Ill. 2d 251, 256 (1982); see also *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 31 (citing *Mays* to define "bodily harm"). On appeal, Anjum challenges the *credibility* of the State's evidence, not whether the evidence satisfied a certain element of the offense.

¶ 32    At trial, Nimet testified that Anjum struck her in the back of the head with a hard object; grabbed her shoulders; punched her in the back; squeezed her neck with both hands; pulled her by the hair; bashed her head against the wall multiple times; kicked her; and punched her in the stomach. Afsha testified that, when she arrived at the home, Nimet had bruising on her neck and scratches on at least one arm. Detective Zahn testified that, at the hospital, he observed bruising on Nimet's neck, a bump on her head, and scratches on her arms and hands. The photographs taken by Afsha at the home depict bruising on Nimet's neck and scratches on both her arms. We conclude that a rational trier of fact could therefore find that the State proved Anjum guilty of domestic battery beyond a reasonable doubt.

¶ 33    Although Officer Jacobsen's description of Nimet's injuries differed from the testimony of Nimet, Afsha, and Detective Zahn, Officer Jacobsen did not see Nimet later that morning or at the hospital, when Afsha and Detective Zahn observed Nimet's injuries. To the extent Anjum posits that Afsha was angry with him and "may have assisted [Nimet] in fabricating a more convincing story" after Officer Jacobsen's visit, the trier of fact was not obliged to accept that theory in order to find reasonable doubt.  See *People v. Jackson*, 2020 IL 124112, ¶ 70. Likewise, while Anjum notes that Officer Jacobsen testified that Nimet did not report that Anjum choked her or threw the dishes to the floor. Anjum also claims that the photographs taken by the police at the hospital do not depict injuries to Nimet's nose, stomach, or the back of her head. Nevertheless, the trier of fact was charged with resolving any conflicts in the evidence and judging the witnesses' credibility.[3]

_____

[3] In this court, the parties filed a stipulation that the State did not move to impound its exhibits. The parties provided a DVD containing separate folders with the photographs that Afsha took at the house and the photographs taken by the police at the hospital but aver that the latter folder also includes photographs that were not entered at trial and that it cannot be determined which of those photographs were in evidence. Notwithstanding, the trial court viewed all the photographs entered at trial, and those taken by Afsha at the house corroborate Nimet's testimony that defendant choked her.

See *Gray*, 2017 IL 120958, ¶ 35. Here, the trial court found Nimet's testimony very credible, and thus, we will not substitute our judgment for the trial courts, where all the evidence taken in the light most favorable to the State, sufficed to sustain the finding of guilt. See *id.*

¶ 34     Anjum next argues the trial court improperly shifted the burden of proof to him when, in denying his posttrial motion, the court noted that he did not present expert testimony establishing "that it is more reasonable and physiologically more probable" that Nimet's injuries would appear immediately after the incident.

¶ 35     Due process requires that the State prove each element of an offense beyond a reasonable doubt. *People v. Murray*, 2019 IL 123289, ¶ 28. That burden rests with the State throughout trial and does not shift to the defendant. *Id.* A defendant is presumed innocent and is not required to testify or present evidence. *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 62. The trial court is presumed to know and properly apply the law regarding the State's burden of proof, a presumption which stands unless the record contains strong affirmative evidence to the contrary. *Id.* The court may comment on the implausibility of the defense's theories as long as the record shows that the court applied the proper burden of proof in finding the defendant guilty. *Id.* A trial courts' efforts to test, support, or sustain the defense's theories is not an improper dilution or shifting of the burden to the defendant. *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 113.

¶ 36     We find that the record in this case does not contain strong affirmative evidence rebutting the presumption that the trial court properly applied the law regarding the State's burden of proof. Here, Anjum repeatedly argued in the trial court that Nimet's testimony was incredible because Officer Jacobsen did not observe injury to her besides scratches on one arm. In denying defendant's posttrial motion, the trial court noted that no expert witness testified to establish the speed with

which Nimet's injuries would appear. Anjum argues that by that statement, the trial court improperly shifted the burden to him. However, when read in context, it is clear, that the court's observation directly responded to the defense's theory which underpinned its comment. The court explained further that it was rejecting the defense's argument because it had listened to all the testimony and found that the witnesses unimpeached testimony supported Nimet's version of the facts. Further, Anjum gave inconsistent statements to Officer Jacobsen and Detective Zahn. Thus, we find that the trial court's explanation rejecting defense's argument when taken in context, was not an improper shifting of the State's burden of proof. See *id.* (trial court may comment on implausibility of defense's theories so long as record shows it applied proper burden of proof).

¶ 37    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 38    Affirmed.